**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VELSICOL CHEMICAL, LLC, | ) | |
|      Plaintiff | ) | |
| | ) | Case No.  15 cv 02534 |
|   v. | ) | |
| | ) | Honorable Judge |
| WESTCHESTER FIRE INSURANCE | ) | |
| COMPANY, as successor in interest | ) | JURY TRIAL DEMANDED |
| To INTERNATIONAL INSURANCE | ) | |
| COMPANY, | ) | |
|      Defendant | ) | |

## COMPLAINT

Plaintiff, Velsicol Chemical, LLC, as successor to Velsicol Chemical Corporation ("Velsicol"), by its counsel, Greensfelder, Hemker & Gale, P.C., complains against Defendant Westchester Fire Insurance Company, as successor to International Insurance Company ("International"), as follows:

### Nature of the Action

1.    Velsicol brings this action to enforce its rights under insurance policy number 523 2388653 issued to it by International (the "International Policy"). A copy of the International Policy including the endorsements to the International Policy, is attached as Exhibit 1.

2.    Through its complaint, Velsicol seeks to recover damages it has incurred arising from International's failure to meet its contractual obligations under the International Policy as a consequence of International's failure to make the payments due of it in response to claims made by Velsicol under the International Policy.

3.    Additionally, Velsicol seeks declaratory relief pursuant to 28 U.S.C. § 2201concerning the obligations owed to it by International pursuant to the terms of the

International Policy in connection with Velsicol's ongoing defense expenses and obligations to fund the remediation of environmental damages at sites that are the subject of claims made by Velsicol under the International Policy.

## The Parties

4.       Velsicol is an Illinois limited liability company organized under the laws of the State of Illinois. Velsicol's member is an Illinois limited liability company and that entity's member is a Delaware corporation. Velsicol has its principal place of business in Rosemont, Illinois. Prior to September 30, 2008, Velsicol was known as Velsicol Chemical Corporation and was a Delaware corporation with its principal place of business in Rosemont, Illinois.

5.       Velsicol was a subsidiary of Northwest Industries, Inc. at the time Velsicol purchased the International Policy. Northwest Industries, Inc. sold Velsicol to Velsicol's management in or about 1986. Northwest Industries, Inc. subsequently changed its name to Fruit of the Loom, Inc.

6.       Defendant International is a foreign property and casualty insurance company that is a resident of Pennsylvania. International transacted business within the State of Illinois at times material to the claims asserted in this complaint.

7.       This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332. There is complete diversity between the parties, and the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of $75,000.

8.    This Court has venue over this matter pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events and omissions giving rise to the claims that are the subject of this litigation occurred within this judicial district.

### The Insurance Policies

9.    At the times material to the claims at issue, Velsicol and its predecessors in interest, engaged in the manufacture, distribution, sale, marketing, and disposal of a variety of specialty chemical products.

10.    Velsicol's products were manufactured, distributed, sold, marketed and disposed of at various sites throughout the United States.

11.    Velsicol and its predecessors in interest purchased a variety of insurance products to address the risks associated with its business operations.

12.    In particular, Velsicol purchased various standard-form primary comprehensive general liability policies providing coverage for the period from November 1947 through January 1983 containing non-negotiated type standard-form language to Velsicol.

13.    The obligations assumed by the primary carriers arose under language substantially similar to the following:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury

3

or property damage, even if any of the allegations of the suit are groundless, false or fraudulent.

14.     Velsicol's underlying primary comprehensive general liability insurance policy applicable to the International Policy, for the period from January 1, 1983 through January 1, 1985, was Transportation Insurance Company Policy No. MAN 007 436 945 with a $1,000,000 per occurrence limit (the "Transportation Policy I"). A copy of Transportation Policy I is attached as Exhibit 2.

15.     Velsicol's underlying primary comprehensive general liability insurance policy applicable to the International Policy, for the period from January 1, 1985 through January 1, 1986 was Transportation Insurance Company Policy No. CCP 001 702094 with a $1,000,000 per occurrence limit (the "Transportation Policy II"). A copy of Transportation Policy II is attached as Exhibit 3.

16.     All of the primary comprehensive general liability insurance coverage that Velsicol purchased for the policy periods spanning November 1947 through January 1986 has been exhausted by payment of claims, settlements or through the insolvency of the insurance carriers.

17.     Velsicol purchased the International Policy, excess liability insurance policy number 523 238865 3, for the policy period from January 1, 1983 through January 1, 1986. Velsicol is the named insured on the International Policy.

18.     Except as otherwise addressed in the International Policy, the International Policy follows the form of the underlying primary insurance policies identified in Schedule A to the International Policy.

19.     The per occurrence limit for the International Policy during the period from January 1, 1983 through January 1, 1985 was $25,000,000 per occurrence. The per occurrence limit for the International Policy during the period from January 1, 1985 through January 1, 1986 was $15,000,000 per occurrence.

20.     Pursuant to the International Policy, the insurer agreed "to pay on behalf of the insured the ultimate net loss in excess of the retained limit hereunder stated, which the insured may sustain by reason of the liability imposed upon the insured by law, arising out of an occurrence or assumed by the insured under contract for:

        (a)     Personal Injury Liability

        (b)     Property Damage Liability.... "

**Exhibit 1**.

21.     The International Policy defines "Personal Injury" as "(a) bodily injury, sickness, disease, disability, shock, mental anguish and mental injury...."

22.     The International Policy defines "Property Damage" as "physical injury to, destruction of or loss of use of tangible property."

23.     The International Policy defines "Occurrence" for the purposes of bodily injury and property damage coverage as "either an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same conditions ... considered as arising out of one occurrence."

24.     International's liability for bodily injury and property damage under the International Policy is the ultimate net loss in excess of the insured's retained limit as

defined as the greater of: (a) the total of the applicable limits of the underlying policies listed in Schedule A to the International Policy, and the applicable limits of any other insurance collectible by the insured; or (b) an amount as stated in item 4(C) of the declarations as the result of any one occurrence not covered by the said policies or insurance; and then up to an amount not exceeding the amount as stated in item 4(A) of the declarations as the result of any one occurrence.

25.     Under the International Policy, there is no limit as to the number of occurrences during the policy period for which claims may be made, except that the liability of the company arising out of the products hazard on account of all occurrences during each policy year shall not exceed the aggregate amount stated in Item 4(B) of the declarations.

26.     The International Policy provides that in the event of the reduction of the aggregate limits of liability of the underlying policies listed in Schedule A to the International Policy by reason of losses paid under the underlying insurance policies, the International Policy, subject only to the limitations described in the International Policy, shall pay the excess of the reduced underlying limits.

27.     The International Policy also provides that in the event of the exhaustion of the aggregate limits of liability of the underlying policies listed in Schedule A to the International Policy by reason of losses paid under the underlying insurance policies, the International Policy, subject only to the limitations described in the International Policy, shall continue in force as underlying insurance.

28. The International Policy defines "Ultimate Net Loss" for the purposes of bodily injury and property damage coverage as the total of the following sums with respect to each occurrence:

    a. All sums which the insured, or any company as his insurer, or both, is legally obligated to pay as damages, whether by reason of adjudication or settlement, because of personal injury or property damage to which the International Policy applies; and

    b. All expenses, other than defense settlement provided in the International Policy, incurred by the insured in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding only the salaries of the insured's regular employees, provided "ultimate net loss" does not include any damages or expense because of liability excluded by the International Policy.

29. The International Policy also provides that it is not applicable to defense, investigation, settlement or legal expenses covered by underlying insurance.

30. Transportation Policy I has a $1,000,000 per occurrence limit.

31. Transportation Policy II has a $1,000,000 per occurrence limit.

32. There is no coverage available to Velsicol under Transportation Policy I.

33. There is no coverage available to Velsicol under Transportation Policy II.

## Count I
## Breach Of Contract Adame Case

34. Velsicol repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein as the allegations of this paragraph 34.

35.     In 2008, Velsicol was sued in the Superior Court of the State of California, County of Santa Clara, in the matter *Adame v. State of California*, et al, No.1-08-CV-106710 (the "Adame Case").

36.     The plaintiffs in the Adame Case amended their complaint on July 9, 2008 adding claims against Velsicol, an entity that had previously been 'identified' as "Doe 41" in the original complaint.

37.     The plaintiffs in the Adame Case filed a second amended complaint on October 20, 2008.

38.     In the Adame Case, approximately one hundred thirty three (133) individuals filed suit complaining of bodily injuries and property damages that they attributed to the actions of various entities including Velsicol.

39.     The plaintiffs in the Adame Case complained of personal injuries and property damages that they alleged arose from exposure to various chemicals, including chlordane, that the plaintiffs claimed had migrated onto properties owned or occupied by them, as a consequence of the actions of defendants including Velsicol.

40.     The plaintiffs in the Adame Case alleged that they were exposed to various dangerous neurotoxic, developmental, mutagenic and carcinogenic toxins that had been applied to the vegetation and soil at various times over a period of time from 1921 until 2003 at a site located at 90 North Winchester Boulevard, San Jose, California ("BAREC").

41.     The plaintiffs in the Adame Case alleged that chemicals to which they were exposed that caused their injuries, including chlordane, were manufactured and distributed by Velsicol.

8

42.     The plaintiffs in the Adame Case complained that Velsicol encouraged, approved, or knowingly took part in or ratified the testing of chlordane at BAREC and that chlordane was among the toxins of which they complained.

43.     The complaint in the Adame Case asserts that the various toxins remained in the soil at BAREC as well as in the aquifer below BAREC and had migrated onto the properties owned or occupied by them causing serious bodily injury as well as property damage.

44.     The plaintiffs in the Adame Case sought recovery of special damages, including medical care, monitoring expenses, loss of earning or earning capacity, property damage, damages for pain and suffering, the costs of the suit, pre-judgment interest, and punitive damages.

45.     After becoming aware of the Adame Case, Velsicol tendered the claim to its insurers including International.

46.     The claims asserted against Velsicol in the Adame Case fall within the definition of "personal injury" used in the International Policy.

47.     The claims asserted against Velsicol in the Adame Case fall within the definition of "property damage" used in the International Policy.

48.     At the time Velsicol tendered the claim pertaining to the claims asserted in the Adame Case, the coverage under its primary comprehensive general liability policies, including the coverage under Transportation Policy I and Transportation Policy II, had been exhausted.

49.     The Adame Case asserted claims for occurrences that arose within the the policy periods covered by the International Policy.

9

50. The claims asserted against Velsicol in the Adame Case fall within the coverage of the International Policy.

51. As a consequence of the exhaustion of the underlying primary comprehensive general liability insurance policies, including Transportation Policy I and Transportation Policy II, International was obligated to indemnify and defend Velsicol for the bodily injury and property damage claims asserted against it in the Adame Case.

52. International failed to accept Velsicol's tender of its defense in the Adame Case.

53. As a consequence of International's failure to accept Velsicol's tender of defense, Velsicol was required to fund its own defense.

54. Velsicol incurred more than one million dollars in defense expenses in defending against the allegations of the Adame Case.

55. Facing the burden of funding its escalating defense costs on its own, and the risk of a substantial verdict, Velsicol ultimately settled with the plaintiffs.

56. Denied coverage by International's failure to accept the claim, Velsicol was required to fund the entirety of the settlement without contribution from International.

57. Velsicol incurred more than one million dollars in settlement of the claims asserted against it in the Adame Case.

58. Velsicol performed its obligations under the terms of the International insurance policy in connection with the Adame Case.

59. International breached its obligations to Velsicol owed under the International Policy by failing to pay for Velsicol's defense of the claims asserted in the Adame Case.

60. Additionally, International breached its contractual obligations to Velsicol owed under the International Policy by failing to indemnify Velsicol for the amount that Velsicol paid to settle the Adame Case.

61. As a consequence of International's breaches of its contractual obligations owed under the International Policy related to the Adame Case, Velsicol incurred damages in excess of $2,000,000.00.

WHEREFORE, Velsicol asks for judgment in its favor and against International for the damages that it proves at trial and for such other relief as this Court deems just.

## Count II
## Breach Of Contract Shenkel Case

62. Velsicol repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein as the allegations of this paragraph 62.

63. In 2008, Velsicol was sued in the Superior Court of the State of California in the matter *Shenkel v. Velsicol* (the "Shenkel Case").

64. In the Shenkel Case, the plaintiff alleged that he had been employed as a landscaper and gardener during the period from 1969 until 2007 and that in that work, he was exposed to a variety of herbicides and pesticides including chlordane.

65. The plaintiff in the Shenkel Case alleged that the chemicals to which he was exposed and that caused his injuries, including chlordane, were manufactured, sold, and distributed by Velsicol.

66. The plaintiff in the Shenkel Case alleged that as a consequence of his exposure to herbicides and pesticides manufactured, sold and distributed by Velsicol, including chlordane, he developed Parkinson's disease.

67. The plaintiff in the Shenkel Case sought special damages, including medical care and for pain and suffering for the injuries he claimed to have sustained as a consequence of his exposure to the chemicals, including chlordane, that he alleged were manufactured, sold, and distributed by Velsicol.

68. After becoming aware of the Shenkel Case, Velsicol tendered the claim to its insurers including International.

69. The coverage under its primary comprehensive general liability policies, including the coverage under Transportation Policy I and Transportation Policy II applicable to the Shenkel Case, had been exhausted.

70. The claims asserted against Velsicol in the Shenkel Case fall within the definition of "personal injury" used in the International Policy.

71. The claims asserted against Velsicol in the Shenkel Case fall within the coverage of the International Policy.

72. The claims asserted against Velsicol in the Shenkel Case are occurrences within the policy periods covered by the International Policy.

73. As a consequence of the exhaustion of the underlying primary comprehensive general liability insurance policies, including Transportation Policy I and Transportation Policy II, International was obligated to indemnify and defend Velsicol for the bodily injury claim asserted against it in the Shenkel Case.

74.     International failed to accept Velsicol's tender of its defense in the Shenkel Case.

75.     As a consequence of International's failure to accept Velsicol's tender of defense, Velsicol was required to fund its own defense.

76.     Velsicol incurred substantial defense expenses in defending against the allegations of the Shenkel Case.

77.     Facing the burden of funding its escalating defense costs on its own and the risk of a substantial verdict presented by the claims asserted against it in the Shenkel Case, Velsicol ultimately settled with the plaintiff in the Shenkel Case.

78.     Denied coverage by International's failure to accept the claim, Velsicol was required to fund the entirety of the settlement without contribution from International.

79.     Velsicol performed its obligations under the terms of the International insurance policy in connection with the Shenkel Case.

80.     International breached its contractual obligations to Velsicol under the International Policy by its failure to pay for Velsicol's defense of the claims asserted in the Shenkel Case.

81.     Additionally, International breached its contractual obligations to Velsicol owed under the International Policy by failing to indemnify Velsicol for the amount that Velsicol paid to settle the Shenkel Case.

82.     As a consequence of International's breaches of its contractual obligations to Velsicol related to the Shenkel Case, Velsicol incurred damages.

WHEREFORE, Velsicol asks for judgment in its favor and against International of the damages that Velsicol proves at trial and for such other relief as this Court deems just.

**Count III**
**Breach Of Contract Acevedo Case**

83.     Velsicol repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein as the allegations of this paragraph 83.

84.     In September 1999, a number of individuals filed suit against Union Pacific in Hidalgo County, Texas, in the matter *Acevedo, et al. v. Union Pacific*, et al, No.C4 885-99J (the "Acevedo Case"). The plaintiffs in the Acevedo Case complained that they were exposed to various chemicals released at chemical storage sites, chemical formulation sites, and from distribution sites owned, controlled, or used by various defendants.

85.     In 2001, the complaint in the Acevedo Case was amended, and Velsicol was added as a party.

86.     At the time Velsicol was added as a defendant, the Acevedo Case was a mass tort action that had expanded to encompass claims filed by and on behalf of more than one thousand eight hundred (1,800) individuals and the estates of individuals complaining of bodily injuries and death arising from exposure to various toxic chemicals including chlordane that was manufactured, sold, or distributed by Velsicol.

87.     The plaintiffs in the Acevedo Case complained that Velsicol had manufactured, sold, and distributed chemicals, including chlordane, that caused the injuries of which they complained.

88.     The plaintiffs in the Acevedo Case complained that the chemicals tht caused their injuries, including chlordane, had gotten into the air, water, and soil in their community as a consequence of Velsicol's negligence.

89.     The plaintiffs in the Acevedo Case sought special damages, including medical care, monitoring expenses, loss of earning or earning capacity, property damage, damages for pain and suffering, the costs of the suit, pre-judgment interest, and punitive damages for the injuries that they contend were caused by chemicals, including chlordane, that they asserted were manufactured and distributed by Velsicol.

90.     After becoming aware of the Acevedo Case, Velsicol tendered the claim to its insurers including International.

91.     The claims asserted against Velsicol in the Acevedo Case fall within the definition of "personal injury" used in the International Policy.

92.     The claims asserted against Velsicol in the Acevedo Case fall within the definition of "property damage" used in the International Policy.

93.     The claims asserted by the plaintiffs in the Acevedo Case are occurrences arising in the coverage periods encompassed by the International Policy.

94.     The claims asserted against Velsicol in the Acevedo Case fall within the coverage of the International Policy.

95.     The coverage under its primary comprehensive general liability policies, including the coverage under Transportation Policy I and Transportation Policy II applicable to the Acevedo Case, has been exhausted.

96.     As a consequence of the exhaustion of the underlying primary comprehensive general liability insurance policies, including Transportation Policy I and

15

Transportation Policy II, International was obligated to defend Velsicol for the bodily injury and property damage claims asserted against it in the Acevedo Case and to indemnify Velsicol for the defense expenses incurred by Velsicol in the Acevedo Case.

97.     International failed to accept Velsicol's tender of its defense in the Acevedo Case.

98.     As a consequence of International's failure to accept Velsicol's tender of defense, Velsicol was required to fund its own defense.

99.     Velsicol has incurred nearly two million dollars in defense expenses in defending against the allegations of the Acevedo Case.

100.    Velsicol continues to incur defense costs to defend itself against the claims asserted against it in the Acevedo Case.

101.    Facing the burden of funding its escalating defense costs on its own, and the risk of a substantial verdict, Velsicol ultimately negotiated the terms of a settlement agreement with the plaintiffs.

102.    The settlement agreement negotiated in the Acevedo Case has not yet been ratified by the requisite number of plaintiffs to make it effective.

103.    In the event the settlement negotiated in the Acevedo Case is ratified, Velsicol will be obligated to pay one million dollars toward the settlement.

104.    To this date, despite Velsicol's best efforts, it has not been able to obtain the ratification of the settlement of the Acevedo Case.

105.    In the event that the Acevedo Case is not settled, Velsicol will be required to go to trial on the cases of each of the claims brought by the plaintiffs.

106. Velsicol performed its obligations under the terms of the International insurance policy in connection with the Acevedo Case.

107. International breached its contractual obligations owed under the International Policy by failing to pay for Velsicol's defense of the claims asserted in the Acevedo Case.

108. As a consequence of International's breaches of its contractual obligations under the International Policy, Velsicol incurred damages in excess of $2,000,000.00.

WHEREFORE, Velsicol asks for judgment in its favor and against International for the damages that Velsicol proves at trial and for such other relief as this Court deems just.

## Count IV
### Declaratory Judgment: Acevedo Case

109. Velsicol repeats and realleges the allegations of paragraphs 1 through 33 and 84 through 108 as if fully set forth herein as the allegations of this paragraph 109.

110. A justiciable controversy exists between Velsicol and International concerning International's obligations to Velsicol under the International Policy with respect to the Acevedo Case including its duty to pay for Velsicol's defense on a going forward basis as well as to indemnify it in connection with the settlement agreement negotiated in the Acevedo Case.

WHEREFORE, Velsicol asks that the Court enter judgment in its favor and against International declaring that International is obligated to pay Velsicol's defense expenses incurred in the Acevedo Case as those expenses are incurred.

## Count V
### Breach Of Contract: Arlington Blending Site

111.     Velsicol repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein as the allegations of this paragraph 111.

112.     Velsicol was joined as a party in the matter of *United States of America v. Monsanto Company, William Bell, and Robert Meeks*, Case No. 86-2862-TUV pending in the United States District Court for the Western District of Tennessee, Western Division (the "Arlington Blending Litigation") pertaining to a site known as the Arlington Blending and Packaging Superfund Site in Arlington, Shelby County, Tennessee (the "Arlington Blending Site").

113.     The issue in the Arlington Blending Litigation was environmental damage alleged to have been caused by chemicals manufactured, sold, distributed, stored, or used by various entities at the Arlington Blending Site in Tennessee.

114.     Among the chemicals alleged to have caused the environmental hazards constituting the property damage at issue in the Arlington Blending Litigation was chlordane alleged to have been manufactured and distributed by Velsicol in addition to other chemicals manufactured and distributed by Velsicol.

115.     Velsicol was identified as a potentially responsible party for the contamination of the environmental conditions at the Arlington Blending Site in 1991 including as the manufacturer and supplier of the chlordane at issue as well as of other chemicals found at the Arlington Blending Site.

116.     Velsicol was joined as a party to the Arlington Blending Litigation and various third-parties asserted claims against Velsicol relating to the property damage at the Arlington Blending Site.

117. All of the underlying primary comprehensive general liability insurance coverage applicable to Velsicol's claim relating to the Arlington Blending Site, including its coverage under the Transportation Policy I and Transportation Policy II, has been exhausted.

118. The claims at issue in the Arlington Blending Litigation and the property damage at the Arlington Blending Site are occurrences within the policy period encompassed by the International Policy.

119. Velsicol tendered its defense of the claims relating to the Arlington Blending Site to its insurers including International.

120. International did not respond to Velsicol's tender.

121. Velsicol was required to incur substantial defense expenses in response to its claim pertaining to the Arlington Blending Site.

122. On or about August 16, 1996, Velsicol entered into a consent decree pursuant to which it was obligated to fund certain remediation to address environmental conditions at that site.

123. In 1997, Velsicol entered into settlement agreements with various parties to the Arlington Blending Litigation settling those claims.

124. Under the terms of the settlements that Velsicol reached related to the Arlington Blending Site, Velsicol was obligated to contribute substantial funding on an ongoing basis, including through the current date and into the future, to remediate the environmental damage to the Arlington Blending Site attributed to Velsicol.

125. Velsicol has been required to pay substantial amounts as a consequence of the property damage it is alleged to have caused at the Arlington Blending Site.

126. Velsicol will be required to pay additional substantial sums as a consequence of the property damage Velsicol is alleged to have caused at the Arlington Blending Site.

127. Velsicol's claim pertaining to the Arlington Blending Site falls within the coverage of the International Policy.

128. Velsicol has performed its obligations under its contract with International.

129. International has failed to reimburse Velsicol for any of the expenses or costs associated with Velsicol's defense or settlement of the Arlington Blending Litigation and damages to the Arlington Blending Site.

130. International has breached its contractual obligations to Velsicol in connection with Velsicol's claim related to the Arlington Blending Site.

131. Through the present date, Velsicol has incurred in excess of $10 million to pay defense costs and remediate the property damages at the Arlington Blending Site.

WHEREFORE, Velsicol asks for judgment in its favor and against International for the damages that Velsicol proves at trial and for such other relief as this Court deems just.

### Count VI
### Breach Of Contract: Chattanooga Site

132. Velsicol repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein as the allegations of this paragraph 132.

133. Velsicol owned a 45 acre chemical manufacturing plant located in Chattanooga, Tennessee (the "Chattanooga Plant").

134.     The Chattanooga Plant was built in 1948 and operated the Chattanooga Plant as a manufacturing facility from 1963 until 2007 at which it manufactured chlorinated toluene-based products.

135.     As a consequence of studies undertaken pursuant to directives from state and federal agencies, it was determined that the operations at the Chattanooga Plant have resulted in extensive groundwater and soil contamination arising from the facility.

136.     The investigations found that Velsicol's operations at the Chattanooga Plant caused damage to the property beyond the borders of the Chattanooga Plant.

137.     Velsicol has been ordered by state and federal regulators to remediate the environmental conditions arising from Velsicol's operation of the Chattanooga Plant.

138.     Velsicol is alleged to have caused property damage beyond the Chattanooga Plant as a consequence of the migration of contaminants beyond the Chattanooga Plant.

139.     Velsicol gave notice of the written demands that it has received from state and federal regulatory agencies pursuant to which it is required to remediate the environmental conditions beyond the boundaries of the Chattanooga Plant alleged to have been caused by Velsicol's operation of the Chattanooga Plant to its primary comprehensive general liability insurance carriers as well as to International (the Chattanooga Claim").

140.     All of the underlying primary comprehensive general liability insurance coverage applicable to the Chattanooga Claim, including Velsicol's insurance coverage under the Transportation Policy I and Transportation Policy II, has been exhausted.

141.    Velsicol's Chattanooga Claim falls within the coverage of the International Policy.

142.    The occurrences at issue in the Chattanooga Claim took place within the period covered by the International Policy.

143.    International did not respond to Velsicol's tender of the Chattanooga Claim.

144.    Velsicol was obligated to contribute substantial funding on an ongoing basis, through the current date to remediate the environmental conditions at issue in the Chattanooga Claim.

145.    Velsicol has incurred in excess of $10 million in defense costs and remediation costs to address the environmental conditions that the state and federal governments have attributed to Velsicol in connection with the Chattanooga Claim, including the property damage beyond the boundaries of the Chattanooga Plant that is alleged to have been caused by contaminants alleged to have been produced by Velsicol at the Chattanooga Plant and that have migrated beyond the Chattanooga Plant.

146.    Velsicol has performed its obligations under its contract with International with respect to the Chattanooga Claim.

147.    International has failed to reimburse Velsicol for any of the expenses or costs associated with Velsicol's defense or settlement of the Chattanooga Plant.

148.    Through its silence in response to Velsicol's tender of Velsicol's claim arising from Velsicol's operations at the Chattanooga Plant, International has disavowed legal responsibility for funding the remediation of the property damage alleged to have been caused by Velsicol's activities at the Chattanooga Plant.

149. International has breached its contractual obligations to Velsicol in connection with Velsicol's Chattanooga Claim.

WHEREFORE, Velsicol asks for judgment in its favor and against International for the damages that Velsicol proves at trial and for such other relief as this Court deems just.

## Count VII
## Breach of Contract Cypress Creek

150. Velsicol repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein as the allegations of paragraph 150.

151. Cypress Creek was a storm water drainage ditch in and around Memphis, Tennessee, that collects run off and discharges the run off into the Wolf River.

152. During the time period from approximately 1952 until approximately 1963, prior to the completion of the City of Memphis' sewer collection system, Velsicol discharged wastewater generated from its operations into Cypress Creek.

153. Upon completion of the City of Memphis' sewer collection system, Velsicol discharged the wastewater generated from its operations into Memphis' sewer collection system.

154. Velsicol's releases of wastewater into Cypress Creek released pesticide contamination into the soils and sediments along the creek.

155. The natural flow of the creek, including seasonal flooding, caused contaminated soil and sediment to overflow into the environs of Cypress Creek.

156. The City of Memphis engaged in certain construction work in Cypress Creek's bed and the environs of Cypress Creek that resulted in some of the contaminated soil and sediment to be relocated causing the contamination to spread outside the creek.

157.    Among the actions undertaken by the City of Memphis was the installation of a concrete liner for portions of Cypress Creek in order to control erosion of the contaminated sediments and soils found in Cypress Creek.

158.    In 2003 and 2004, Velsicol entered into settlement agreements to provide for the settlement of the State of Tennessee's past Superfund responses related to Cypress Creek and the remediation of the environmental conditions alleged to have been caused by Velsicol.

159.    In January 2005, the City of Memphis advised Velsicol that a 30 foot long section of the concrete lining that the City of Memphis had constructed in Cypress Creek to contain the contaminated soil and sediments had failed such that the contaminated soil and sediments that had been contained by the concrete liner were no longer contained.

160.    Additionally, Velsicol has been sued by various property owners in the area of Cypress Creek complaining that soil and sediment that had been contaminated by waste discharged by Velsicol into Cypress Creek had caused property damage. Among the entities that have complained of property damage attributed to contaminants discharged by Velsicol is Springdale Memphis LP, an entity that owned the Springdale Apartments.

161.    Velsicol has been required to incur substantial defense expenses and costs to remediate property damage claims related to Cypress Creek including claims related to the Springdale Apartments.

162.    In connection with settlements that Velsicol has entered related to property damage claims related to discharges into Cypress Creek, Velsicol has been required to establish a soil consolidation area at its Memphis Plant to store contaminated soil

24

removed from the environs of the Memphis Plant including from the Springdale Apartments.

163.    The property damage claims asserted against Velsicol are claims within the coverage of the International Policy.

164.    The property damage claims that Velsicol has been required to address related to Cypress Creek are occurrences within the policy period encompassed by the International Policy.

165.    Velsicol tendered the claim related to the property damage resulting from the discharge of wastewater into Cypress Creek (the "Cypress Creek Claim") to its insurers including International.

166.    The coverage under its primary comprehensive general liability policies, including the coverage under Transportation Policy I and Transportation Policy II applicable to the Cypress Creek Claim has been exhausted.

167.    As a consequence of the exhaustion of the underlying primary comprehensive general liability insurance policies applicable to the Cypress Creek Claim, including Transportation Policy I and Transportation Policy II, International was obligated to defend Velsicol for the bodily injury and property damage claims asserted against it in the litigation that Velsicol has faced relating to Cypress Creek and to indemnify Velsicol for the defense expenses incurred by it to respond to litigation related to Cypress Creek.

168.    International is obligated to reimburse Velsicol for the expenses it has incurred in remediation of the environmental conditions at issue in the Cypress Creek Claim.

169.    The claims asserted against Velsicol in the Cypress Creek Claim fall within the definition of "property damage" used in the International Policy.

170.    International failed to accept Velsicol's tender of its defense in the Cypress Creek Claim.

171.    As a consequence of International's failure to accept Velsicol's tender of defense or fund the remediation of the property damage at issue in the Cypress Creek Claim, Velsicol was required to fund its own defense and fund the remediation required to address the Cypress Creek Claim.

172.    Velsicol has incurred millions of dollars in defense expenses as well as in remediation to respond to the Cypress Creek Claim.

173.    Velsicol continues to incur defense costs and remediation costs in response to the Cypress Creek Claim.

174.    International's failure to pay for Velsicol's defense of the claims and remediation expenses to respond to the property damage asserted in the Cypress Creek Claim is a breach of International's contractual obligations owed under the International Policy.

175.    As a consequence of International's breaches, Velsicol incurred millions of dollars of damages.

WHEREFORE, Velsicol asks for judgment in its favor and against International for the damages that Velsicol proves at trial and for such other relief as this Court deems just.

## Count VIII
### Breach Of Contract: Marshall Site

176.     Velsicol repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein as the allegations of this paragraph 176.

177.     Velsicol owned and operated a chemical manufacturing facility in Marshall, Illinois (the "Marshall Plant") beginning in 1935.

178.     Originally, Velsicol produced petroleum derivatives and resins at that plant.

179.     Beginning in 1940, the Marshall Plant was the primary site at which Velsicol manufactured the pesticide chlordane.

180.     Process waters from the manufacturing of chlordane at the Marshall Plant permeated the soil and tributaries in the area of the Marshall Plant.

181.     Contaminants from Velsicol's operations at the Marshall Plant spread beyond the boundaries of the Marshall Plant causing property damage beyond the boundaries of the Marshall Plant.

182.     After the Marshall Plant was closed, Velsicol was ordered by state and federal regulators to remediate the site to stop the spread of contaminants from the site and to remediate the soil and groundwater beyond the boundaries of the Marshall Plant.

183.     State and federal environmental agencies claimed that Velsicol's activities at the Marshall Plant caused property damage beyond the boundaries of the Marshall Plant.

184.     The remediation ordered by them was designed to address the property damage beyond the boundaries of the Marshall Plant caused by Velsicol's operations at the Marshall Plant.

185.    Velsicol gave notice of the written demands that it has received from state and federal regulatory agencies pursuant to which it is required to remediate the environmental conditions emanating from the Marshall Plant to its primary comprehensive general liability insurance carriers as well as to International (the "Marshall Claim").

186.    The Marshall Claim includes the expense Velsicol incurred when it was ordered to demolish the buildings at the Marshall Plant and to remove the sediment from the waterways abutting the Marshall Plant to address the contaminants that were spreading beyond the boundaries of the Marshall Plant.

187.    In the Marshall Claim, Velsicol is alleged to have caused property damage beyond the boundaries of the Marshall Plant as a consequence of Velsicol's operations at the Marshall Plant.

188.    The Marshall Claim falls within the coverage of the International Policy.

189.    The occurrences at issue in the Marshall Claim are occurrences within the policy period encompassed by the International Policy.

190.    Velsicol gave notice of the written demands that it has received from state and federal regulatory agencies pursuant to which it is required to remediate the environmental conditions emanating from the Marshall Plant to its primary comprehensive general liability insurance carriers as well as to International.

191.    All of the underlying primary comprehensive general liability insurance coverage applicable to Velsicol's Marshall Claim, including its coverage under the Transportation Policy I and Transportation Policy II, has been exhausted.

192.    Velsicol has incurred in excess of $17 million in defense costs and remediation costs to address the environmental conditions that the state and federal governments have attributed to it in connection with the Marshall Claim.

193.    International did not respond to Velsicol's tender of the Marshall Claim.

194.    Velsicol has performed its obligations under its contract with International with respect to the claim related to the Marshall Plant.

195.    International has failed to reimburse Velsicol for any of the expenses or costs associated with Velsicol's defense or settlement of the Marshall Claim.

196.    Through its silence in response to Velsicol's tender of Velsicol's Marshall Claim, International has disavowed legal responsibility for the Marshall Claim.

197.    International has breached its contractual obligations to Velsicol in connection with the Marshall Claim, and Velsicol has been damaged by International's failure to meet its contractual obligations to Velsicol in connection with the Marshall Claim.

WHEREFORE, Velsicol asks for judgment in its favor and against International for the damages that Velsicol proves at trial and for such other relief as this Court deems just.

### Count IX
### Breach Of Contract: Mathis Shaver Farm Site

198.    Velsicol repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein as the allegations of this paragraph 198.

199.    The United States commenced an action to recover costs from Velsicol for the remediation of a superfund site located in Walker County Georgia (the Shaver's Farm

Site") for damage caused by materials Velsicol caused to be shipped to the Shaver's Farm Site (the "Shaver's Farm Claim").

200.    In the Shaver's Farm Claim, the United States EPA asserted that waste shipped by Velsicol for storage at the Shaver's Farm Site caused damage to the property at the Shaver's Farm Site.

201.    The United States EPA ordered that Velsicol fund past remediation at the Shaver's Farm site and fund the remediation of the Shaver's Farm Site on a going forward basis to address the property damage caused by Velsicol's actions.

202.    Velsicol timely tendered the Shaver's Farm Claim to its insurance carriers including International.

203.    All of the underlying primary comprehensive general liability insurance coverage applicable to Velsicol's claim relating to the Shaver's Farm Claim, including its coverage under the Transportation Policy I and Transportation Policy II, has been exhausted.

204.    The Shaver's Farm Claim is a property damage claim within the coverage of the International Policy.

205.    The occurrence alleged in the Shaver's Farm Claim is an occurrence within the policy period covered by the International Policy

206.    In 1997, Velsicol was ordered to pay more than $6.2 million in past remediation costs as well as to fund the remediation of the Shaver's Farm Site on a going forward basis.

207.    Through the current date, Velsicol has incurred defense costs exceeding $4.5 million in connection with the Shaver's Farm Claim.

208.  Through the current date, Velsicol has incurred remediation costs of approximately $11.5 million in connection with the Shaver's Farm Claim.

209.  Velsicol has performed its obligations under its contract with International with respect to the claim related to the Shaver's Farm Claim.

210.  Through its silence in response to Velsicol's tender of Velsicol's Shaver's Farm Claim, International has disavowed legal responsibility for funding the defense costs and the remediation of the Shaver's Farm Site.

211.  International has failed to reimburse Velsicol for any of the expenses or costs associated with Velsicol's defense or settlement of the Shaver's Farm Claim.

212.  International's failure to fund or reimburse Velsicol for Velsicol's defense and remediation expenses incurred in connection with the Shaver's Farm Claim is a breach of International's contractual obligations to Velsicol owed under the International Policy.

WHEREFORE, Velsicol asks for judgment in its favor and against International for the damages that it proves at trial and for such other relief as this Court deems just.

## Count X
## Breach Of Contract: Mathis Marble Top Site

213.  Velsicol repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein as the allegations of this paragraph 213.

214.  Between 1973 and 1979, Mose and Sidney Mathis operated a 10 acre non-hazardous industrial waste landfill in Walker County Georgia (the "Mathis Marble Top Site").

215.  Velsicol shipped waste from its plant in Chattanooga, Tennessee to Mathis Marble Top during the period from 1973 until 1980.

31

216. After Velsicol shipped waste to the Mathis Marble Top Site, contaminants began to leak from the storage containers into the soil and water.

217. The Mathis Marble Top Site was proposed as a national priority list site for environmental remediation in 1987 and listed as a national priority site in 1989.

218. Velsicol was first ordered by the United States EPA to remediate the Mathis Marble Top Site (the "Marble Top Claim").

219. Since the EPA's original Record of Decision, Velsicol's remediation obligations have been modified and expanded.

220. Velsicol gave notice of the Marble Top Claim to its insurers including International.

221. All of the underlying primary comprehensive general liability insurance coverage applicable to Velsicol's claim relating to the Marble Top Claim, including its coverage under the Transportation Policy I and Transportation Policy II, has been exhausted.

222. The Marble Top Claim is a property damage claim falling within the coverage of the International Policy.

223. The Marble Top Claim is a claim for an occurrence within the coverage period encompassed by the International Policy.

224. International has failed to accept Velsicol's Marble Top Claim.

225. As a consequence of International's failure to respond to Velsicol's tender of the Marble Top Claim, Velsicol has incurred approximately $2.5 million in defense costs in connection with the Marble Top Claim.

32

226.    As a consequence of International's failure to respond to Velsicol's tender of the Marble Top Claim, Velsicol has incurred approximately $9.8 million to remediate the environmental conditions at the Marble Top Site.

227.    Velsicol has performed its obligations under its contract with International with respect to the claim related to the Marble Top Site.

228.    International has failed to reimburse Velsicol for any of the expenses or costs associated with Velsicol's defense or settlement of the Marble Top Claim.

229.    Through its silence in response to Velsicol's tender of Velsicol's Marble Top Claim arising from the Marble Top Site, International has disavowed legal responsibility for funding the remediation of the Marble Top Site.

230.    International has breached its contractual obligations under the insurance policy that Velsicol purchased from International in connection with the Marble Top Claim.

WHEREFORE, Velsicol asks for judgment in its favor and against International for the damages that Velsicol proves at trial and for such other relief as this Court deems just.

## Count XI
### Breach Of Contract: Memphis Site

231.    Velsicol repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein as the allegations of this paragraph 231.

232.    Velsicol owns an 83 acre site in Memphis, Tennessee at which it manufactured pesticides from the 1950 until 1997 (the "Memphis Site").

233.    State and federal regulators have determined that the ground water and soil at and emanating from the Memphis Site are contaminated and are causing damage to property beyond the boundaries of the Memphis Plant.

234.    State and federal regulators have ordered that Velsicol remediate the environmental conditions at and beyond the boundaries of the Memphis Site (the "Memphis Claim").

235.    In particular, state and federal regulators have determined that Velsicol's manufacturing operations at the Memphis Site have resulted in property damage beyond the boundaries of the Memphis Site.

236.    State and federal regulators have ordered that Velsicol fund the remediation of the property damage resulting from Velsicol's operations at the Memphis Site.

237.    Velsicol gave notice of the Memphis Claim to its insurers including International.

238.    All of the underlying primary comprehensive general liability insurance coverage applicable to Velsicol's Memphis Claim, including its coverage under the Transportation Policy I and Transportation Policy II, has been exhausted.

239.    The Memphis Claim falls within the coverage of the International Policy.

240.    The Memphis Claim pertains to an occurrence within the policy period encompassed by the International Policy.

241.    Velsicol has incurred in excess of $4. 7 million in defense costs to date in connection with the Memphis Claim.

242.     Velsicol has incurred in excess of $11 million in connection with the remediation of the property damage alleged in the Memphis Claim.

243.     International has failed to reimburse Velsicol for any of the expenses or costs associated with Velsicol's defense or settlement of the Memphis Claim.

244.     Through its silence in response to Velsicol's tender of the Memphis Claim, International has disavowed legal responsibility for funding the Memphis Claim.

245.     Velsicol performed its obligations under the terms of the International Policy in connection with the Memphis Claim.

246.     Velsicol has been damaged by International's failure to reimburse Velsicol for the defense costs and remediation expenses incurred by Velsicol in connection with the Memphis Claim.

247.     International has breached its contractual obligations to Velsicol in connection with the Memphis Claim.

WHEREFORE, Velsicol asks for judgment in its favor and against International for the damages that Velsicol proves at trial and for such other relief as this Court deems just.

### Count XII
### Declaratory Judgment: Arlington Blending Site

248.     Velsicol repeats and realleges the allegations of paragraphs 1 through 33 and 112 through 130 as if fully set forth herein as the allegations of this paragraph 248.

249.     Velsicol has been obligated to contribute substantial funding on an ongoing basis, through the current date and into the future, to remediate the environmental conditions attributed to it at the Arlington Blending Site.

250. Velsicol remains obligated to fund the remediation of the Arlington Blending Site.

251. A justiciable controversy exists between Velsicol and International concerning International's obligations to Velsicol under the International Policy with respect to the Arlington Blending Site including its duty to pay for Velsicol's defense on a going forward basis as well as to indemnify it in connection with the settlement agreement negotiated in the Arlington Blending Site.

WHEREFORE, Velsicol asks that the Court enter judgment in its favor and against International declaring that International is obligated to pay Velsicol's defense expenses incurred in the Arlington Blending Site as those expenses are incurred and that it indemnify Velsicol for the ongoing expenses associated with the remediation of the Arlington Blending Site.

### Count XIII
### Declaratory Judgment: Cypress Creek Claim

252. Velsicol repeats and realleges the allegations of paragraphs 1 through 33 and 151 through 175 as if fully set forth herein as the allegations of this paragraph 252.

253. A justiciable controversy exists between Velsicol and International concerning International's obligations to Velsicol under the International Policy with respect to the Cypress Creek Claim including its duty to pay for Velsicol's defense and remediation of property damages related to the Cypress Creek Claim on a going forward basis.

WHEREFORE, Velsicol asks that the Court enter judgment in its favor and against International declaring that International is obligated to pay Velsicol's defense expenses as they are incurred in connection with the Cypress Creek Claim and that

International indemnify Velsicol for the ongoing expenses to remediate the property damage attributed to Velsicol in connection with the Cypress Creek Claim.

## Count XIV
### Declaratory Judgment: Chattanooga Site

254.    Velsicol repeats and realleges the allegations of paragraphs 1 through 33 and 113-149 as if fully set forth herein as the allegations of this paragraph 254.

255.    Velsicol has been obligated to contribute substantial funding on an ongoing basis, through the current date and into the future, to remediate the environmental conditions including those beyond the borders of the Chattanooga Plant attributed to Velsicol arising from Velsicol's operations at the Chattanooga Plant.

256.    Velsicol remains obligated to fund the remediation of the property damage alleged to have been caused by Velsicol's manufacturing operations at the Chattanooga Plant.

257.    A justiciable controversy exists between Velsicol and International concerning International's obligations to Velsicol under the International Policy with respect to the Chattanooga Plant including its duty to pay for Velsicol's defense on a going forward basis as well as to indemnify it in connection with the settlement agreement negotiated in connection with the Chattanooga Claim.

WHEREFORE, Velsicol asks that the Court enter judgment in its favor and against International declaring that International is obligated to pay Velsicol's defense expenses incurred in the Chattanooga Claim as those expenses are incurred and that it indemnify Velsicol for the ongoing expenses associated with the remediation of the property damage attributed to Velsicol in connection with the Chattanooga Claim.

## Count XV
### Declaratory Judgment: Marble Top Site

258.    Velsicol repeats and realleges the allegations of paragraphs 1 through 33 and 214 through 230 as if fully set forth herein as the allegations of this paragraph 258.

259.    Since the EPA's original Record of Decision, Velsicol's remediation obligations have been modified and expanded.

260.    Velsicol's remediation obligations with respect to the Marble Top Site continue and are anticipated to continue at least through 2027.

261.    Velsicol has been obligated to contribute substantial funding on an ongoing basis, through the current date and into the future, to remediate the environmental conditions attributed to it at the Marble Top Site.

262.    Velsicol remains obligated to fund the remediation of the Marble Top Site.

263.    A justiciable controversy exists between Velsicol and International concerning International's obligations to Velsicol under the International Policy with respect to the Marble Top Claim including its duty to pay for Velsicol's defense on a going forward basis as well as to indemnify it in connection with the remediation of the Marble Top Site on a going forward basis.

WHEREFORE, Velsicol asks that the Court enter judgment in its favor and against International declaring that International is obligated to pay Velsicol's defense expenses incurred in responding to the Marble Top Claim as those expenses are incurred and that it indemnify Velsicol for the ongoing expenses associated with the remediation of the Marble Top Site.

**Count XVI**
**Declaratory Judgment: Memphis Site**

264.    Velsicol repeats and realleges the allegations of paragraphs 1 through 33 and 232 through 247 as if fully set forth herein as the allegations of this paragraph 264.

265.    Velsicol will continue to incur defense costs and remediation costs in connection with the Memphis Claim on a going forward basis.

266.    A justiciable controversy exists between Velsicol and International concerning International's obligations to Velsicol under the International Policy with respect to the Memphis Claim including its duty to pay for Velsicol's defense on a going forward basis as well as to indemnify it in connection with the remediation required in connection with the Memphis Claim on a going forward basis.

WHEREFORE, Velsicol asks that the Court enter judgment in its favor and against International declaring that International is obligated to pay Velsicol's defense expenses incurred in responding to the Memphis Claim as those expenses are incurred and that it indemnify Velsicol for the ongoing expenses associated with the remediation required to be funded by Velsicol in connection with the Memphis Claim.

Dated: March 25, 2015

Respectfully submitted,

VELSICOL CHEMICAL, LLC

By /s/ David B. Goodman
        One of its Attorneys

David B. Goodman - dbg@greensfelder.com
ARDC # 6201242
200 West Madison Street Suite 2700
Chicago, IL 60606
Telephone: 312-345-5008
Firm I.D. 45175

8675v1