**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VELSICOL CHEMICAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-CV-2534 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| WESTCHESTER FIRE INSURANCE | ) | |
| COMPANY, as successor in interest to | ) | |
| INTERNATIONAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On March 25, 2015, Plaintiff Velsicol Chemical, LLC filed a Complaint seeking

contractual damages and to enforce its rights to defense and indemnity under an excess insurance

policy, number 523 2388653 (the "Policy"), issued to it by International Insurance Company.

Before the Court is Defendant Westchester Fire Insurance Company's Motion for Summary

Judgment on all remaining counts in Plaintiff Velsicol Chemical, LLC's Complaint for

contractual damages and declaratory judgment. (R. 76.)[1] For the following reasons, the Court

denies Defendant's motion. (R. 76.)

## BACKGROUND

Velsicol is a limited liability company with its principal place of business in Rosemont,

Illinois. (R. 78, Def's 56.1(a)(3) Stmt. of Facts, at ¶ 2.) Until September 30, 2008, Velsicol was

---

[1] Defendant previously filed a Motion for Partial Summary Judgment, (R. 49), on Counts III through XVI of
Plaintiff's Complaint. The Court granted summary judgment in favor of Defendant on Counts VIII through XI, XV,
and XVI based on *res judicata* but denied as to Counts III-VII and XII-XIV. The parties stipulate that Counts VIII,
IX, X, XI, XV, and XVI are no longer at issue. *See* (R. 114).

known as Velsicol Chemical Corporation.  (*Id.* at ¶ 3.)  International Insurance Company

("International") issued the Policy to Velsicol for the period of January 1, 1983 to January 1,

1986.  (*Id.* at ¶ 4.)  Pursuant to an Assumption and Indemnity Reinsurance Agreement effective

January 1, 1993, the Policy was reinsured by Westchester, with Westchester assuming all of the

rights and obligations of International under the Policy.  (*Id*. at ¶ 5.)  Westchester is a

Pennsylvania corporation that conducted business within the State of Illinois at all relevant times.

(*Id.*)

I.    **The Policy**

During the pertinent time period, Velsicol had two underlying primary comprehensive

general liability insurance policies.  For the period from January 1, 1983 through January 1,

1985, the comprehensive general liability insurance policy was Transportation Insurance

Company Policy No. MAN 007 436 945, which had a $1,000,000 per occurrence limit.  (R. 1,

Compl. at ¶ 14.) For the period from January 1, 1985 through January 1, 1986, the

comprehensive general liability insurance policy was Transportation Insurance Company Policy

No. CCP 001 702094, which had a $1,000,000 per occurrence limit.  (*Id.* at ¶ 15.)  Under the

terms of the Policy, Westchester is not responsible for claims until the underlying primary

coverage is exhausted.  (R. 60, Pl's 56.1(b)(c)(3) Stmt. of Facts, at ¶ 25.)

The Policy defines the following relevant terms, in pertinent part, as follows:

A.    **Occurrence**

With respect to Coverage 1(a) and 1(b) "occurrence" means either an accident or

happening or event or a continuous or repeated exposure to conditions which unexpectedly and

unintentionally causes injury to persons or tangible property during the policy period.  All

damages arising out of such exposure to substantially the same general conditions are to be considered as arising out of one occurrence.

 (R. 1-1, Policy at p. 25-26.)

### B. Notice of Occurrence

Upon the happening of an occurrence reasonably likely to involve the company hereunder, written notice shall be given as soon as practicable to the company or any of its authorized agents.  Such notice shall contain particulars sufficient to identify the insured and the fullest information obtainable at the time.

The Insured shall give like notice of any claim made on account of such occurrence.  If legal proceedings are begun the insured, when requested by the company, shall forward to it each paper thereon, or a copy thereof, received by the insured or the insured's representatives, together with copies of reports of investigations made by the insured with respect to such claim proceedings.

(R. 1-1, Policy at p. 27 at ¶ D.)

### C. Personal Injury

"Personal injury" means (a) bodily injury, sickness, disease disability, shock, mental anguish and mental injury; (b) false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution or humiliation; (c) libel, slander, defamation of character or invasion of rights of privacy, unless arising out of any advertising activities; (d) discrimination not committed by or at the direction of the insured; and (e) assault and battery not committed by or at the direction of the insured, unless committed for the purpose of protecting the property of the insured or the person or property of others.

(R. 1-1, Policy at p. 25.)

### D. Property Damage

"Property damage" means physical injury to, destruction of or loss of use of property.

(R. 1-1, Policy at p. 25.)

### E. Products Hazard

"Products Hazard" means (a) the handling or use of or the existence of any condition in or a warranty of goods or products manufactured, sold, handled, or distributed by the named insured or by others trading under its name, if the occurrence happens away from premises owned by, rented to or controlled by the named insured; provided such goods or products shall be deemed to include any container, thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container rented to or located for use of others not sold; or (b) operations, if the occurrence happens after such operations have been completed or abandoned and happens away from premises owned by, rented to or controlled by the named insured; provided further, the following shall not be deemed to be "operations" within the meaning of this paragraph: (aa) pick-up or delivery except from or onto a railroad car, (bb) the maintenance of vehicles owned or used by or on behalf of the insured, (cc) the existence of tools, uninstalled equipment and abandoned or unused materials.

(R. 1-1, Policy at p. 25 at ¶ 6.)

### F. Pollution Exclusion

This policy shall not apply: . . . (e) under Coverage 1(a) or 1(b) to liability arising out of the discharge dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, discharge dispersal, release or escape is sudden and accidental.

(R. 1-1, Policy at p. 26 at ¶ (e).)

Part I of this policy does not apply: . . . (h) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; course or body of water, but this exclusion does not apply if such discharge, discharge dispersal, release or escape is sudden and accidental.  (R. 1-2, Gen. Liability Policy at p. 14 at ¶ (h).)

## II.    Factual Background

On October 15, 1998, Velsicol filed a Second Amended Complaint in the Circuit Court of Cook County captioned "Fruit of the Loom, Inc. and Velsicol Chemical Corporation v. Admiral Insurance Company, *et al.*," (the "Illinois State Court Action"), against International, among others.  (R. 78, Def's 56.1(a)(3) Stmt. of Facts, at ¶ 6.)  In the Illinois State Court Action, Velsicol alleged claims for declaratory judgment and/or breach of contract against, among others, International and sought defense and indemnity coverage under the Policy for numerous sites, including certain sites at issue in this suit.  (*Id.* at ¶ 7.)  The sites at issue in the present suit and the Illinois State Court Action are:  (a) Chattanooga Site (Counts VI and XIV of the present suit); (b) Marshall Site (Count VIII of the present suit); (c) Mathis Shaver's Farm Site (Count IX of the present suit); (d) Mathis Marble Top Site (Counts X and XV of the present suit); and (e) Memphis Site (Counts XI and XVI of the present suit).  (*Id.*)

### A.    Adame Case

The plaintiffs in the Adame Case alleged that they were exposed to various dangerous neurotoxic, developmental, mutagenic, and carcinogenic toxins that had been applied to the

vegetation and soil at various times over a period of time from 1921 until 2003 at a site located at 90 North Winchester Boulevard, San Jose, California. (*Id.* at ¶ 77.)

**B.     Shenkel Case**

In 2008, Velsicol was sued in the State of California in a case captioned "Shenkel v. Velsicol," (the "Shenkel Case"). (*Id.* at ¶ 8.) The plaintiff in the Shenkel Case alleged that he was exposed to, and injured by, chemicals manufactured, sold, and distributed by Velsicol. (*Id.* at ¶ 9.) Velsicol first became aware of the Shenkel Case when it was filed. (*Id.* at ¶ 10.) Velsicol's corporate witness testified that Velsicol would have given notice to Westchester at that time but did not recall seeing a Velsicol document doing so. (*Id.* at ¶ 11.) Velsicol's corporate witness did testify that he had seen internal memos from International, showing that they were aware of the litigation. (R. 79-5, Orlando Declaration, Exh. D Harvell Dep. at 290: 18-24.)

**C.     Acevedo Case**

In 2001, Velsicol was added as a defendant in a Texas suit against Union Pacific captioned "Acevedo, *et al.*, v. Union Pacific, *et al.*" (R. 78, Def's 56.1(a)(3) Stmt. of Facts, at ¶¶ 79-80.) The plaintiffs in the Acevedo Case alleged that they were exposed to various chemicals, including chlordane that was manufactured sold, or distributed by Velsicol, released at chemical storage sites, chemical formulation sites, and from distribution sites, owned, controlled or used by various defendants. (*Id.*)

**D.     Arlington Blending Site**

Velsicol became aware of allegations of contamination at the Arlington Blending site in 1983, after receiving notice of a joint action by the United States Environmental Protection Agency (the "EPA") and the State of Tennessee. (*Id.* at ¶ 12.) In 1986, Velsicol was joined as a

party in a suit captioned "United States of America v. Monsanto Company, William Bell, and Robert Meeks" in the United States District Court for the Western District of Tennessee. (*Id.* at ¶ 13.) In 1991, Velsicol was identified as a potentially responsible party for environmental contamination at the Arlington Blending site as the manufacturer and supplier of the chlordane at issue as well as other chemicals found at the site. (*Id.* at ¶ 14.) On or about August 16, 1996, Velsicol entered into a consent decree under which it was obligated to fund certain remediation to address environmental conditions at the Arlington Blending site. (*Id.* at ¶ 15.) In 1997, Velsicol entered into settlement agreements with various parties to the litigation. (*Id.* at ¶ 16.) Velsicol provided notice to Westchester of an occurrence, claim, or suit at the Arlington Blending site in 2002 or 2003. (*Id.* at ¶ 17.) Velsicol's corporate witness testified: "But I would imagine that a notice was given in advance of that. I just -- I don't have -- because it would have been up to '99 by -- it would have been made by Farley by either Burgess Ridge or Dave Henriksen." (R. 79-1, Orlando Declaration, Exh. A Harvell Dep. at 255: 19-23.)

### E. Chattanooga Plant

Velsicol owned a 45-acre chemical manufacturing plant located in Chattanooga, Tennessee (the "Chattanooga Plant"). (R. 78, Def's 56.1(a)(3) Stmt. of Facts, at ¶ 18.) The plant was built in 1948, and Velsicol operated it from 1963 until 2007, where Velsicol manufactured chlorinated toluene-based products. (*Id.*) It was determined that operations at the Chattanooga Plant have resulted in extensive groundwater and soil contamination. (*Id.* at ¶ 19.) In 1979 or 1980, Velsicol became aware that the EPA was investigating the allegation that contamination from the Chattanooga plant had resulted in contamination of a spring. (*Id.* at ¶ 20.) Velsicol provided notice to Westchester of an occurrence, claim, or suit at the Chattanooga Plant when International was named as a defendant in the Illinois State Court Action in 1997. (*Id.* at ¶ 22.)

### F.       Cypress Creek

Velsicol became aware of the existence of contamination at the Cypress Creek site due to

a Resource Conservation and Recovery Act ("RCRA") investigation of the Memphis Plant site

conducted by the EPA and the State of Tennessee from 1989 through 1993 or 1994.  (*Id.* at ¶ 23.)

In 2003 and 2004, Velsicol entered into settlement agreements to provide for settlement of past

Superfund responses related to Cypress Creek and the remediation of the environmental

contamination Velsicol allegedly caused.  (*Id.* at ¶ 24.)  In 2005, the City of Memphis informed

Velsicol that a 30 foot long section of concrete lining containing the contaminated soil and

sediments in Cypress Creek had failed.  (*Id.* at ¶ 25.)  Various property owners in the area of

Cypress Creek also sued Velsicol, complaining that contaminated soil and sediments caused

property damage, including Springdale Apartments.  (*Id.* at ¶ 26.)  Velsicol has been required to

establish a soil consolidation area at its Memphis Plant to store contaminated soil removed from

around the Memphis Plant, including from the Springdale Apartments.  (*Id.* at ¶ 27.)  Velsicol

did not identify a specific date that it gave notice to Westchester of an occurrence, claim or suit

at the Cypress Creek site.  (*Id.* at ¶ 28.)  Velsicol's corporate witness testified that Velsicol would

have given notice, at a minimum, at the time Velsicol believed the primary care coverage was

exhausted, which was when Velsicol reached settlements related to the Illinois State Court

Action.  (R. 79-1, Orlando Declaration, Exh. A Harvell Dep. at 261:3-9.)  He also testified that it

was likely that notice was sent before then.  (*Id.* at 261:13-262:1.)

### G.       Marshall Site

On July 15, 1988, the EPA notified Velsicol that it was a potentially responsible party at

the Marshall site.  (R. 78, Def's 56.1(a)(3) Stmt. of Facts, at ¶ 29.)  On May 17, 1989, the EPA

filed a lawsuit in the United States District Court for the Southern District of Illinois relating to

contamination at the site, and, later that year, the State of Illinois filed a lawsuit against Velsicol in the same court relating to contamination at the site. (*Id.* at ¶ 30.) On September 29, 1989, the district court approved and entered a consent decree that required Velsicol to remediate the site, pay the EPA $1.2 million, and establish and fund an operation and maintenance program for the site for a minimum period of thirty years. (*Id.* at ¶ 31.) Velsicol provided notice of the claims relating to the Marshall site at the time the Illinois State Court Action was field in October 1997. (*Id.* at ¶ 32.) Velsicol's corporate witness testified that it "probably" provided notice earlier than the Illinois State Court Action but could not give a specific date. (R. 79-1, Orlando Declaration, Exh. A Harvell Dep. at 263:5-264:2.)

### H. Mathis Shaver's Farm Site

On October 15, 1987, the EPA issued an administrative order, requiring Velsicol to perform environmental remediation at the Mathis Shaver's Farm site. (R. 78, Def's 56.1(a)(3) Stmt. of Facts, at ¶ 33.) The administrative order was modified in 1988 and 1989, requiring Velsicol to conduct additional testing and remediation efforts. (*Id.* at ¶ 34.) On October 24, 1994, the EPA issued another order, directing Velsicol to take certain steps to remediate the site. (*Id.* at ¶ 35.) On October 31, 1994, the EPA filed suit against Velsicol for recovery of $6 million in costs and expenses relating to the site. (*Id.* at ¶ 36.) Velsicol sent Westchester a letter, dated February 3, 1995, regarding claims related to the Mathis Shaver's Farm site. (*Id.* at ¶ 37.)

### I. Mathis Marble Top Site

On December 11, 1987, the EPA sent a letter notifying Velsicol that the EPA had documented the release or threatened release of hazardous substances at the Mathis Marbletop site. (*Id.* at ¶ 38.) The letter also informed Velsicol that the EPA had designated Velsicol as a potentially responsible party regarding contamination at the site. (*Id.*) On November 2, 1988,

the EPA issued an administrative order directing Velsicol to conduct a remedial investigation of the site and to prepare a feasibility study for environmental remediation measures at the site. (*Id.* at ¶ 39.) On August 19, 1993, the EPA issued an order requiring Velsicol to develop a remedial design and to perform remedial action at the site. (*Id.* at ¶ 40.) Velsicol's first notice to Westchester of the claims relating to the Mathis Marble Tip site was in October 1997, at the time of the Illinois State Court Action. (*Id.* at ¶ 41.)

### J. Memphis Plant Site

On June 17, 1986, the EPA issued an administrative order directing Velsicol to conduct an analysis of the nature of environmental contamination at the Memphis Plant site. (*Id.* at ¶ 42.) Velsicol was required to perform environmental response activities for previously contaminated areas on the Memphis Plant premises, according to undated investigations done under the RCRA and the Tennessee Hazardous Waste Management Act. (*Id.* at ¶ 43.) On September 30, 1986, the EPA issued a comprehensive RCRA Facility Assessment Report for the site. (*Id.* at ¶ 44.) Velsicol's first notice to Westchester of the claims relating to the Memphis site was at the time the Illinois State Court Action was filed in October 1997. (*Id.* at ¶ 45.)

### K. Primary Policy Exhaustion

From 1995 through 1997, Stephanie McLaughlin was employed as an environmental claims specialist and, in that capacity, was the adjustor responsible for the handling of Velsicol's claims on behalf of Westchester. (R. 60, Pl's 56.1(b)(c)(3) Stmt. of Facts, at ¶ 18.) On January 6, 1997, McLaughlin created a "Strategic Plan" for the Velsicol account. (*Id.* at ¶ 19.) McLaughlin's January 6, 1997 Strategic Plan indicated that she had received a report from a law firm representing London Market Claims Services advising that Velsicol had incurred $95,129,111 in total costs associated with sites for which it had made insurance claims as of

December 31, 1995.  (*Id.* at ¶ 20.)  McLaughlin's January 6, 1997 Strategic Plan included a report, also from the law firm representing London Market Claims Services, stating that the costs incurred by Velsicol in connection with its claims, as well as anticipated costs associated with those claims in which the costs incurred, exceeded $70,000,000.  (*Id.* at ¶ 21.)

Velsicol engaged Ross Mishkin of the Claro Group to evaluate and allocate its historical expenditures for claims potentially within the coverage of the Westchester insurance policy.  (*Id.* at ¶ 22.)  Based on Mishkin and the Claro Group's investigation of Velsicol's historical environmental and products liability claims, and the associated expenses and costs, Velsicol's expenditures in connection with its claims exceeded $170 million.  (*Id.* at ¶ 23.)

From March 2005 through the present, Michael Dinenberg has been the claims adjuster on behalf of Westchester responsible for handling Velsicol's claims.  (*Id.* at ¶ 6.)  At the time of the Illinois State Court Action, International denied that the state lawsuit had exhausted the primary coverage.  (*Id.* at ¶ 8.)  On or about April 11, 2014, Dinenberg created a memorandum in which he documented that the primary coverage underlying the insurance policy at issue had been exhausted, but stated that some other underlying policies are arguably not exhausted because those policies have product aggregates but not general aggregates.  (*Id.* at ¶ 13.)

Westchester maintains that the underlying primary policies are not exhausted under the terms of the Policy, and that Velsicol has not met its burden of proving primary coverage exhaustion.  (*Id.* at ¶ 15.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of some alleged factual dispute will not defeat summary judgment." *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) (quoting *Anderson*, 477 U.S. at 247-48).

In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted); *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015).

## ANALYSIS

Under Illinois law, an insurer has a duty to indemnify "when the insured becomes legally obligated to pay damages in the underlying action that gives rise to a claim under the policy." *Allied Prop. & Cas. Ins. Co. v. Metro N. Condo. Ass'n*, 850 F.3d 844, 847 (7th Cir. 2017) (quoting *Traveler's Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 491 (Ill. 2001)). "Once the insured has incurred liability as a result of the underlying claim, an insurer's duty to indemnify arises only if the insured's activity and the resulting loss or damage actually fall within the CGL policy's coverage." *Id.* (internal citations and quotations omitted). The duty to defend arises "if the complaint alleges facts that are even potentially within the coverage of the insurance policy." *Id.* (citing *Ohio Cas. Ins. Co. v. Bazzi Constr. Co.*, 815 F.2d 1146, 1147 (7th Cir. 1987)).

Westchester moves for summary judgment on each remaining count, arguing that Velsicol's claims are not covered by the Policy. Westchester specifically argues that Velsicol's notice of claims was untimely as a matter of law for the claims involving the Shenkel Case (Count II), the Arlington Blending Site (Counts V and XII), the Chattanooga Site (Counts VI and XIV), and the Cypress Creek Site (Counts VII and XIII). In addition, Westchester contends that Velsicol failed to meet its burden of proving an exception to the pollution exclusion which precludes coverage for claims involving the Arlington Blending Site (Counts V and XII), the Chattanooga Site (Counts VI and XIV), and the Cypress Creek Site (Counts VII and XIII). Finally, Westchester argues that Velsicol has failed to show the exhaustion of all triggered primary policies.

## I.      Breach of Notice

Westchester argues that Velsicol's notice of the claims for the Shenkel Case (Count II); the Arlington Blending Site (Counts V and XII); the Chattanooga Site (Counts VI and XIV); and the Cypress Creek Site (Counts VII and XIII) was untimely as a matter of law.

Under Illinois law, insurance policy notice provisions impose valid prerequisites to insurance coverage. *Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 856 N.E.2d 338, 343 (Ill. 2006). When a policy requires notice "[a]s soon as practicable," it is interpreted to mean "within a reasonable time." *Id.* (quoting *Barrington Consolidated High School v. American Insurance Co.*, 319 N.E.2d 25 (Ill. 1974)). "Whether notice has been given within a reasonable time depends on the facts and circumstances of each case." (*Id.*) The Illinois Supreme Court has given several factors to guide consideration of whether notice was given within a reasonable time: "(1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of an event that may trigger

insurance coverage; (4) the insured's diligence in ascertaining whether policy coverage is available; and (5) prejudice to the insurer." *W. Am. Ins. Co. v. Yorkville Nat. Bank*, 939 N.E.2d 288, 293-94 (Ill. 2010). The failure to give reasonable notices defeats "the right of the insured party to recover under the policy, regardless of whether the lack of notice prejudiced the insurer." *Country Mut. Ins. Co.*, 856 N.E.2d at 343.

Illinois courts, however, examine reasonable notice differently in the context of excess insurance policies. An "excess policy generally requires notice of an occurrence or suit 'when it appears likely' that the excess policy will be implicated." *Zurich Ins. Co. v. Walsh Const. Co. of Illinois*, 816 N.E.2d 801, 806 (Ill. App. Ct. 2004) (citing *Tribune Co. v. Allstate Ins. Co.*, 715 N.E.2d 263, 271-72 (Ill. App. Ct. 1999)). Illinois courts consider "when a reasonable person would have believed it reasonably likely that the claim would implicate the excess insurance." *Id.* (quoting *Tribune*, 715 N.E.2d at 272).

The notice provision in the Policy is substantially similar to the one discussed in *Tribune Co.* In *Tribune Co.*, the court examined excess policies involving notice when "a claim or occurrence 'appears likely to result in liability' in excess of the policy's minimum, or when a claim or occurrence is 'reasonably likely to involve' the insurer." *Tribune Co.*, 715 N.E.2d at 271. The notice provision at issue states: "Upon the happening of an occurrence *reasonably likely to involve the company* hereunder, written notice shall be given *as soon as practicable* to the company or any of its authorized agents." (R. 1-1, Policy at p. 27 at ¶ D) (emphasis added). The question, therefore, is "when a reasonable person would have believed it reasonably likely that the claim would implicate the excess insurance." *Zurich Ins. Co.*, 816 N.E.2d at 806 (quoting *Tribune*, 715 N.E.2d at 272).

Westchester does not address the portion of the notice requirement at issue that requires notice when it is reasonably likely to implicate the excess policy or the differences between primary coverage policies and excess policies under Illinois law. Additionally, the parties dispute whether or not primary coverage has been exhausted at all, let alone at what point claims were reasonably likely to involve the excess policy. Given the language of the policy here, "what constitutes reasonable notice in this case depends upon when a reasonably prudent person could foresee a suit involving the excess coverage and would contact his or her insurer." *Zurich Ins. Co.*, 816 N.E.2d at 807. When notice was provided and whether that notice was reasonable under the terms of the Policy are genuinely disputed material facts.

Because Velsicol has presented evidence creating a genuine dispute as to material facts for trial, the Court denies Defendant's summary judgment motion based on breach of notice as to the claims related to the Shenkel Case (Count II), the Arlington Blending Site (Counts V and XII), the Chattanooga Site (Counts VI and XIV), and the Cypress Creek Site (Counts VII and XIII).

## II. Pollution Exclusion

Westchester argues that Velsicol failed to meet its burden of proving an exception to the pollution exclusion, precluding claims related to the Arlington Blending Site (Counts V and XII), Chattanooga Site (Counts VI and XIV), and Cypress Creek Site (Counts VII and XIII). The Policy does not apply "to liability arising out of the discharge dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but *this exclusion does not apply if such discharge, discharge dispersal, release or escape is sudden and accidental*." (R. 1-1, Policy at p. 26 at ¶ (e)) (emphasis added).

An insurer must affirmatively demonstrate the applicability of an exclusion. *Pekin Ins. Co. v. Miller*, 854 N.E.2d 693, 697 (Ill. App. Ct. 2006) (citing *Johnson Press of America, Inc. v. Northern Insurance Co. of New York*, 791 N.E.2d 1291 (Ill. App. Ct. 2003)). The exclusion's "applicability must be clear and free from doubt because any doubts as to coverage will be resolved in favor of the insured." *Sentry Ins. v. Cont'l Cas. Co.*, 2017 IL App (1st) 161785, ¶ 38, 74 N.E.3d 1110, 1121-22 (Ill. App. Ct. 2017). While insurers have the burden of proving that an exclusion applies, "[i]nsureds, in turn, have the burden to prove that an exception to an exclusion restores coverage." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Insurance Co.*, 611 F.3d 339, 347 (7th Cir. 2010) (applying Illinois law).

A.      **Arlington Blending Site**

Velsicol argues that the "Products Hazard" exception to the pollution exclusion applies to the Arlington Blending Site claims. The Policy provides that the pollution exclusion does not apply to "Products Hazard." (1-1, Policy at p. 19) ("It is hereby agreed and understood that Exclusion (e) of this policy shall not apply to the 'Products Hazard' as defined herein.") The Policy defines "Products Hazard," in pertinent part, as:

> . . . (a) the handling or use of or the existence of any condition in . . . of goods or products manufactured, sold, handled, or distributed by the named insured . . . if the occurrence happens away from premises owned by, rented to or controlled by the named insured . . . or (b) operations, if the occurrence happens after such operations have been completed or abandoned and happens away from premises owned by, rented to or controlled by the named insured . . . .

(R. 1-1, Policy at p. 25 at ¶ 6.)

The Arlington Blending site was a chemical formulator, located in Tennessee, to which Velsicol supplied products that the site processed and packaged. (R. 60, Pl's 56.1(b)(c)(3) Stmt. of Facts, at ¶ 18.) Velsicol did not own or control the Arlington Blending site. (*Id.*) Westchester, citing Indiana law, argues that products hazard coverage does not apply to the

Arlington Blending Site claims because Velsicol supplied unfinished products.  The Seventh

Circuit has held that similar clauses cover "only knowingly completed market transactions and

abandoned product" under Indiana law.  *W. Bend Mut. Ins. Co. v. U.S. Fid. & Guar. Co.*, 598

F.3d 918, 926 (7th Cir. 2010) (citing *Ohio Cas. Ins. Co. v. Reed*, 2006 WL 2348957, at *7 n. 3,

(S.D.Ind. Aug. 11, 2006) ("Indiana courts likely would find that accidental chemical

contamination does not fit within the scope of products hazard coverage."))  Under Illinois law,

however, products hazard "specifically covers injuries caused by accidents resulting from goods

sold if the accident occurs after the possession of the goods has been relinquished to others, and

if the accident occurs away from the premises in question."  *Cobbins v. Gen. Acc. Fire & Life

Assur. Corp.*, 290 N.E.2d 873, 876 (Ill. 1972).  Defendant has not presented facts showing that

Velsicol's supply of products to the Arlington Blending Site was not a completed market

transaction or that Velsicol's possession of the goods had not been relinquished.  At best the

facts are ambiguous, and "any doubts as to coverage will be resolved in favor of the insured."

*Sentry Ins.*, 74 N.E.3d at 1121-22.

Westchester also asserts that Velsicol was found to be a potentially responsible party due

to chemicals manufactured, sold, distributed or stored by Velsicol at the Arlington Blending Site,

which allegedly prevents the Products Hazard definition from applying.  Velsicol, however, was

found to be a potentially responsible party as a manufacturer or supplier of the chemicals that

were sent to the Arlington Blending site.  Westchester does not argue how merely being a

potentially responsible party as the manufacturer or supplier of chemicals makes the Products

Hazard exception inapplicable.

### B.    Permitted Uses

Velsicol argues that genuine issues of material fact pertaining to the pollution exclusion exist because the exclusion is ambiguous with respect to its application to claims arising from permitted uses. For the Cypress Creek Site, Velsicol discharged wastewater from the Memphis Plant in accordance with a state issued discharge permit. (R. 60, Pl's 56.1(b)(c)(3) Stmt. of Facts, at ¶ 34.) Similarly, Velsicol owned the Chattanooga Plant Site operated it in accordance with permits issued by the State of Tennessee. (*Id.* at ¶ 36.) Velsicol cites two cases for its argument that permitted emissions of hazardous substances may not fall under the pollution exclusion. In *Erie Ins. Exch. v. Imperial Marble Corp.*, the court found that "[t]he policy's pollution exclusion is arguably ambiguous as to whether the emission of hazardous materials in levels permitted by an IEPA permit constitute traditional environmental pollution excluded under the policy." *Erie Ins. Exch. v. Imperial Marble Corp.*, 2011 IL App (3d) 100380, ¶ 22, 957 N.E.2d 1214, 1221 (Ill. App. Ct. 2011). In *Country Mut. Ins. Co. v. Bible Pork, Inc.*, the court held that it was ambiguous whether odors, noises, water contamination, and a reduction of property values from a permitted hog factory facility fell under the pollution exclusion in an insurance policy as personal injury or property damage. *Country Mut. Ins. Co. v. Bible Pork, Inc.*, 2015 IL App (5th) 140211, ¶¶ 35-41, 42 N.E.3d 958, 968-70 (Ill. App. Ct. 2015).

As to *Bible Pork, Inc.*, the opinion is silent as to what permits were issued to the hog factory facility and whether those permits were relevant to the alleged pollution. In *Imperial Marble Corp.*, however, the emissions leading to the insured's claim were at levels permitted by the Illinois Environmental Protection Agency. It is uncontested that the discharge of wastewater from the Memphis Plant was made accordance with a state issued discharge permit and that the Chattanooga Plant Site was operated in accordance with permits. (*Id.* at ¶¶ 34, 36.) It is unclear

whether those permits allowed for the discharge of the specific pollutants and what at levels those permits allowed for those pollutants. As the non-moving party, however, all reasonable inferences must be drawn Westchester's favor. *Carson v. ALL Erection & Crane Rental Corp.*, 811 F.3d 993, 997 (7th Cir. 2016). As such, Velsicol has demonstrated genuine issues of material fact pertaining to the pollution exclusion with respect to its application to claims arising from permitted uses.

### C.     Sudden and Accidental

Westchester argues that coverage is precluded because the pollution at issue does not fall under the "sudden and accidental" exception to the pollution exclusion. The Policy provides that the pollution exclusion "does not apply if such discharge, discharge dispersal, release or escape is sudden and accidental." (R. 1-1, Policy at p. 26 at ¶ (e).) Westchester specifically argues that the pollution occurred in the ordinary operation of Velsicol's business and was not sudden or accidental.

"The pollution exclusion has been, and should continue to be, the appropriate means of avoiding the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances into the environment." *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 81 (Ill. 1997) (internal citations and quotations omitted). The term "sudden" has been construed "to mean unexpected or unintended." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1220 (Ill. 1992). In determining if an occurrence is an accident, Illinois courts have stated the question "is whether the injury is expected or intended by the insured, not whether the acts were performed intentionally." *Lyons v. State Farm Fire & Casualty Co.*, 811 N.E.2d 718, 723-24 (Ill. App. Ct. 2004) (citing *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 932 (Ill. 1991); *Aetna Casualty & Surety Co. v. O'Rourke Bros.*,

*Inc.*, 776 N.E.2d 588, 595 (Ill. App. Ct. 2002); *American Family Mutual Insurance Co. v. Enright*, 781 N.E.2d 394, 398 (Ill. App. Ct. 2002)).

The *Lyons* opinion, however, does not address the unique history of the pollution exclusion. As noted by the court in *Keystone Consol. Indus., Inc. v. Employers Ins. Co. of Wausau*, the pollution exclusion has changed over time and "to obtain coverage under the policies issued from 1972 through 1985, when the qualified pollution exclusion was added, the release of the toxic substance must also be unexpected or unintended." *Keystone Consol. Indus., Inc. v. Employers Ins. Co. of Wausau*, 470 F. Supp. 2d 873, 887–88 (C.D. Ill. 2007) (citing *Outboard Marine*, 607 N.E.2d at 1220). The Policy here was effective from 1983-86. Under this analysis, if the spills or releases "were routine and ordinary parts of the business" then "they cannot be labeled unexpected." *Id.* at 895.

Velsicol's corporate witness testified that the chemical spills at the Chattanooga plant resulted from historical operations:

> Q: Mr. Harvell, as to the Chattanooga site, how did the chemicals that you had previously identified for which Velsicol is allegedly liable get into the environment that resulted in that contamination?
>
> A: At Chattanooga it was a manufacturing operation. It was certainly through the historical manufacturing operations, leaks, spills that happened in the loading and unloading process. There was on-site wastewater treatment systems, some lagoons that were earthen line. Processed water gets in that with the contaminants that it carries. It gets in the sediments, in the soil on site. . . . But there were spills, releases, loading, unloading. There was waste disposal. There was [*sic*] a number of instances where there were process upsets . . . There was probably at least one fire at the plant site. It probably resulted in some contamination occurring, just the runoff from that. Leaky process, sewers, there are a lot of sewers early on were in the ground . . . .

(R. 79-5, Orlando Declaration, Exh. D Harvell Dep. at 137:16-139:1.) The corporate witness also testified that those things would not be considered routine business operations:

Q.  And so what you had described, would those be considered routine business procedures or practices that were going on or -- as far as the spills and discharges and so forth during the same period?

A.  No.  We would do our very best not for those things to happen.  We want to try to limit -- not have those even occur.  They do occur, but it is not something we would do intentionally.

(*Id.* at 139:13-21.)

For the Cypress Creek claims, the corporate witness testified that spills at the Memphis site, which eventually made their way into Cypress Creek, were not routine:

Q.  And those discharges and releases that you described, those are part of the routine business operations at the Memphis site?
. . .
A.  No, I wouldn't call them routine. Here again they were out of the norm.  They were not something that we routinely do.  They occurred during the process operations, but we would -- they were not anticipated.  They were not planned for.  It was something you wouldn't want to occur.

(*Id.* at 156:23-157:18.)  The corporate witness also stated that at least some of the pollution was sudden and resulted from fire or explosions:

Q. Okay.  Have there been any sudden and accidental discharge [*sic*] of chemicals at the Memphis site?
. . .
A.  At the Memphis plant site these process upsets that we spoke about earlier, I will have to keep going back to those.  They were sudden, like a fire, a ruptured disc for an air emission going off.  But I can't sit here today and tell you specific times that they happened.

(*Id.* at 206:10-20.)

Whether spills or leaks were accidental or routine and ordinary parts of the business is a disputed question of material fact.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences" from the corporate witness's testimony are jury functions.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Velsicol has

demonstrated genuine issues of material fact pertaining to whether releases were sudden or accidental.

**III.     Primary Coverage Exhaustion**

Finally, Westchester argues the claims do not trigger the Policy because Velsicol has not shown all pertinent primary coverage policies were exhausted.  The Policy is an excess policy which activates when all of the triggered underlying primary coverage is properly exhausted. *See Kajima Const. Servs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 879 N.E.2d 305, 313 (Ill. 2007) ("until the limits of primary insurance coverage are exhausted, secondary coverage does not provide any collectible insurance").  Under Illinois law, a "policy holder or primary insurer must show that all triggered primary policies are exhausted before any excess insurance policies can be required to respond to the claim."  *John Crane, Inc. v. Admiral Ins. Co.*, 2013 IL App (1st) 1093240-B, ¶ 60, 991 N.E.2d 474, 492 (Ill. App. Ct. 2013).

Velsicol has introduced evidence that applicable primary policies have been exhausted. McLaughlin's January 6, 1997 Strategic Plan indicated that she had received reports, from a law firm representing London Market Claims Services, advising that Velsicol had incurred $95,129,111 in total costs associated with sites for which it had made insurance claims as of December 31, 1995, and that the costs incurred by Velsicol in connection with its claims, as well as anticipated costs associated with those claims in which the costs incurred, exceeded $70,000,000. (R. 60, Pl's 56.1(b)(c)(3) Stmt. of Facts, at ¶¶ 20, 21.)  Further, Mishkin and the Claro Group's investigation of Velsicol's claims, and the associated expenses and costs, Velsicol's found expenditures in connection with the claims exceed $170 million.  (*Id.* at ¶ 23.) Additionally, Dinenberg's April 11, 2014 memorandum indicated that the primary coverage underlying the insurance policy at issue has been exhausted but stated that some other underlying

policies are arguably not exhausted because those policies have products aggregates but not general aggregates.  (*Id.* at ¶ 13.)

Velsicol has demonstrated genuine issues of material fact pertaining to whether all primary policies have been exhausted.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's Motion for Summary Judgment (R. 76.)


**DATED:**  September 7, 2017                                    **ENTERED**

                                                               _____
                                                               AMY J. ST. EVE
                                                               United States District Court Judge